IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

WENDY L. PAINTER,

                  Plaintiff,

v.                                             Case No. 2:19-cv-02336-DDC-ADM

MIDWEST HEALTH, INC.,
And PIONEER RIDGE NURSING
FACILITY OPERATIONS, LLC,
d/b/a Pioneer Ridge Health & Rehab,

                  Defendants.

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The Plaintiff, by and through undersigned counsel, submits the following as her response pursuant to Fed. R. Civ. P. 56, D. Kan. Rule 56.1 and this District's Summary Judgment Guidelines to the Defendants' motion for summary judgment, (ECF 78), accompanying memorandum and exhibits, (ECF 79).

The following numbered paragraphs correspond to the numbered paragraphs in the Defendants' memorandum in support of their motion. (ECF 79 at 2-11).

1. Uncontroverted.

2. Controverted, but immaterial. Whether the Plaintiff was an at-will employee, was under a contract of employment, had an implied contract or was a member of a collective bargaining unit does not have relevancy to the issues in this case. Assuming, arguendo, that the nature of the Plaintiff's employment is at issue, the Plaintiff objects. First, the testimony of Ms. Bell on this point is an attempt to instruct the jury as to the law. The employment-at-will doctrine in Kansas stems from a judicial determination. *Anco Construction Co. v. Freeman*, 236 Kan. 626, 629, 693

1

P.2d 805 (1977). Such testimony is unhelpful. *United States v. Jungles*, 903 F.2d 468 (7th Cir. 1990) (experts' recitation of legal principles surrounding "independent contractor" relationship inadmissible). Second, Ms. Bell has not been designated as an expert witness on the various categories of employment. Third, even if Ms. Bell were permitted to opine using her lay opinion, she does not provide any basis in fact to support her conclusion. As such, her testimony exceeds the bounds for lay testimony in Fed. R. Evid. 701. And, such testimony amounts to Ms. Bell instructing the jury on a point of law, or mixed question of law and fact, which infringes on the Court's duty to instruct the jury on points of law. *United States v. Richter*, 796 F.3d 1173, 1194-96 (10th Cir. 2015) (Rule 704 does not permit a witness to instruct the jury how it should rule, if the expert does not provide any basis for that opinion; convictions reversed).

**3.**  Controverted in part. The Plaintiff's employment was not under the complete control of Pioneer Ridge Nursing. See, Plaintiff's ASOFs ¶¶ 85-89; 97; 103-112; 117-122.

4.  a. Uncontroverted.

b. Uncontroverted.

c. Uncontroverted.

d. Uncontroverted.

e. Controverted in part. Pioneer Ridge Nursing used the address for Midwest Health, Inc. to issue paychecks to Painter. See, Plaintiff's ASOF ¶ 115.

f. Uncontroverted.

5. Uncontroverted.

6. Uncontroverted.

7. Uncontroverted.

8. Uncontroverted.

9. Uncontroverted.

10. Uncontroverted.

11. Uncontroverted.

12. Uncontroverted.

13. Controverted in part. Uncontroverted that the Plaintiff did not use the phrase "race discrimination" in her complaints of mistreatment, but controverted to the extent that the Plaintiff compared the treatment she received with that of the treatment received by Black, African-American or African co-workers. See, Plaintiff's ASOF ¶ 86 (Ex. 24, Painter Dep. 106:16-25; 119:1-9) (Ex. 51, Painter Dep Ex. 11) and Painter believes she used the word "discriminating" when she spoke with Bell. See, Plaintiff's ASOF ¶ 85 (Ex. 24, Painter Dep. 93:19-25; 94:1-3)

14. Uncontroverted.

15. Uncontroverted.

16. Controverted in part. Ms. Bell did not complete scheduling of staff on her own until after Plaintiff's termination. (Ex. 52, Bell Dep. 46:14-25; 47:1-8) Before then, Leena (King-Alvoid) normally made out the schedule. (Ex. 52, Bell Dep. 47:22-25)

17. Uncontroverted.

18. Uncontroverted.

19. Controverted. Bell did not participate in making those assignments during the Plaintiff's tenure. (Ex. 52, Bell Dep. 46:14-25; 47:1-8) The second half of the sentence is controverted because it lacks foundation for not identifying other nurses who considered it a "cake walk" to be assigned to the Rapid Recovery Unit. This part of the statement amounts to speculation and is not admissible in evidence as non-hearsay as defined by F.R.E. 801(d)(2)(D) because the declarant provided no name or names of other nurses and what their full statements were beyond the phrase "cake walk."

20. Objection. This statement presents the time-off decisions in a conclusory fashion. Thus, this statement is not adequately supported in the Record and lacks foundation in a form that would be admissible in evidence. Fed. R. Civ. P. 56(c)(2), District Guideline No. 14.

21. Uncontroverted, but immaterial.

22. Uncontroverted, but immaterial.

23. Uncontroverted.

24. Controverted in part. It should be noted that the Plaintiff raised her voice only after the resident's son raised his voice while both were standing in the hallway. (Ex. 24, Painter Dep. 70:13-25; 71:1-9) This dispute differs slightly from PTO Stip. Fact 5 in that the stipulated fact does not describe who initiated using a louder voice, which was in fact the resident's son, and who de-escalated the situation by going to get a different nurse, which in fact was the Plaintiff.

25. Controverted in part. It should be noted that the Plaintiff never refused to take the vital signs of the resident. (Ex. 24, Painter Dep. 70:13-25; 71:1-9) The Defendants do not raise the honest belief provision of Title VII law to defend its conclusion about Painter refusing to take the resident's vital signs, part of the foundation for which is that the employer made a mistake.

26. Uncontroverted.

27. Uncontroverted.

28. Uncontroverted.

29. Controverted.

30. Controverted. The Plaintiff did not admit that by raising her voice in response to the resident's son raising his voice that she had escalated the matter. That the Plaintiff escalated the matter is an inference of the Defendants that is not based on a fact allegation. This dispute differs slightly from PTO Stip. Fact 5 in that the stipulated fact does not specify which of the two escalated or de-escalated the situation. As important, the King-Alvoid deposition excerpt is of the deponent answering an abstract question about raising voices and escalating a situation. She does not state an opinion about whether the resident's son or the Plaintiff escalated the situation. The Bell deposition excerpt contains the allegation of the resident's son that the Plaintiff was waiving her arms around. This is inadmissible hearsay. Fed. R. Evid. 801(a) through (c). Bell's statement indirectly quotes the resident's son. The Defendants offer no statement or evidence directly from the resident's son.

31. Uncontroverted. But it should be noted that Ms. Bell consulted with Ms. Alvoid before making the termination decision. (Ex. 25, King-Alvoid Dep. 199:4-6; 202:1-5) See Plaintiff's ASOF ¶ 77.

32. Controverted in part. Painter was terminated for either for "failing to meet a reasonable request of a family member, although there was no neglect.  (Ex. 7, Report of Incident KDADS, at 2), for violating any other conduct or work rule of a similar nature not specifically mentioned therein (Ex. 3, Employee Disciplinary Action Record, p. 1, Rule 35) (Ex. 53, Ex. 45 of Vogel Dep., Employee Handbook, p. 29 of 51) taking or distributing photos or videos of a resident or their property at any time, (Ex. 3, Employee Disciplinary Action Record, p. 1, Rule 37)  (Ex. 53, Ex. 45 of Vogel Dep., Employee Handbook, p. 29 of 51), violating the Code of Conduct, (Ex. 3, Employee Disciplinary Action Record, p. 1, Rule 56) (Ex. 53, Ex. 45 of Vogel Dep., Employee Handbook, p. 30 of 51), discourteous conduct toward any patient, visitor, doctor, or employee, unprofessional conduct, (Ex. 52, Bell Dep. 90:4-10, Painter Dep. Ex. 8), prior disciplinary notices from at least eleven months before termination and extending back to 2007, (Ex. 26, Sourk Letter, p. 1 & 2), costing the Defendants about $24,000 as a result of an audit by a federal agency, (Ex. 26, Sourk Letter p. 1), or conducted herself unprofessionally in a manner that adversely affected [sic] the facility. (ECF 77, Pretrial Order, Stip. Fact 12) (Ex. 26, Sourk Letter p. 1), or for all of those reasons. Exhibit 6 is a termination document under the control of Midwest Health, Inc. as shown by the inclusion of an email address for questions. It is also impossible to derive the meaning the Defendants attach to it. For "Reason for

6

Separation" the document states, "Disciplinary Process – Category III – N I." There is no other document referenced to explain this coding. In addition, the deposition excerpt does not make reference to the reasons for the termination. Rather, it concerns who was present during the termination meeting.

33. Uncontroverted.

34. Uncontroverted.

35. Uncontroverted.

36. Uncontroverted.

37. Controverted in part. The cited deposition testimony is uncontroverted. But it should be noted that Ms. Bell took into account the views of Ms. Alvoid. (Ex. 25, King-Alvoid Dep. 199:4-6; 202:1-5) See Plaintiff's ASOF ¶ 77.

38. Uncontroverted.

39. Controverted in part. The statement is partially correct, but does not state all reasons that were given for the Plaintiff's termination. See response to ¶ 32.  This differs from the PTO Stip. Fact 12 in that only two of the stated reasons are given.

40. Uncontroverted.

41. Uncontroverted.

42. Uncontroverted.

43. Uncontroverted.

44. Uncontroverted.

45. Uncontroverted.

46. Controverted in part. It is controverted that KDADS conducted its own independent investigation. This differs slightly from the PTO Stip. Fact 14 in that the stipulated fact states that "KDADS conducted its own investigation … " The stipulated fact does not state that KDADS performed an independent investigation.

47. Controverted in part. KDADS' finding was not based on is independent investigation. This differs from the PTO Stip. Fact 15 in that the stipulated fact states that "KDADS investigation resulted … "

48. Controverted in part. The Plaintiff presumes the reference is to Exhibit 5 of the Painter deposition. There was no Exhibit 14 in that deposition. It should be noted that Pioneer Ridge Nursing provided KDADS an outdated address for the Plaintiff. (Ex. 24, Painter Dep. 80:19-25; 81:1-5) (Ex. 27, first page) See Plaintiff's ASOF 80.

49. Uncontroverted.

50. Uncontroverted.

51. Uncontroverted.

52. Uncontroverted.

53. Uncontroverted.

54. a. Uncontroverted.

    b. Uncontroverted.

    c. Uncontroverted.

55. Controverted in part because Painter later moved to add Pioneer Ridge Nursing Facility Operations, LLC. (ECF 49) The Court granted the motion. (ECF 55 at 12) See, Plaintiff's ASOF ¶¶ 84 and 85.

56. Controverted in part to the extent that "waited" suggests there was undue delay in adding Pioneer Ridge Nursing Facility Operations, LLC. See, (ECF 55 at 6) ("Because Painter did not receive clear, accurate information on the correct entity until July 28, and thereafter promptly raised the amendment issue, the court finds good cause for the late amendment.") See also, Plaintiff's Additional Statement of Fact ¶ 84.

57. Uncontroverted.

58. Uncontroverted.

59. Uncontroverted.

60. Controverted in part. To the extent that training, preparation of company policies, preparation of employee handbooks are Human Resources tasks those tasks are performed for Pioneer Ridge Nursing Facility Operations, LLC by Midwest Health, Inc. (Ex. 29, Vogel Dep. 47:10-12) (Ex. 28, Sourk Dep. 18:1-5). See, Plaintiff's ASOF ¶ 89.

61. Uncontroverted. It should be noted that Midwest Health personnel are available for an administrator to consult about discipline decisions. (Ex. 28, Sourk Dep. 88:10-19) See Plaintiff's ASOF ¶ 90.

62. Uncontroverted.

63. Uncontroverted.

64. Uncontroverted.

65. Uncontroverted.

66. Uncontroverted.

67. Uncontroverted.

68. Uncontroverted.

69. Uncontroverted.

70. Controverted in part. Pioneer Ridge Nursing provided an outdated and incorrect address to KDADS for Painter. (Ex. 24, Painter Dep. 80:19-25; 81:1-5) (Ex. 27, first page) See, Plaintiff's ASOF ¶ 80.

71. a. Uncontroverted, but the Plaintiff is not qualified to state a legal opinion about whether the two Defendants were a Single Employer or a Joint Employer. Fed. R. Evid. 704(a). *Randolph v. Collectramatic, Inc.,* 590 F.2d 844, 848 (10th Cir. 1979). Testimony of this nature would also give the appearance of the witness instructing the jury on the law. *United States v. Duncan*, 42 F.3d 97, 102-03 (2d Cir. 1994). Thus, pursuant to Fed. R. Civ. P. 56(c)(2) this material cannot be presented in a form that would be admissible in evidence.

b. Uncontroverted, but the Plaintiff is not qualified to state a legal opinion about whether the two Defendants were a Single Employer or a Joint Employer. Fed. R. Evid. 704(a). *Randolph v. Collectramatic, Inc.,* 590 F.2d 844, 848 (10th Cir. 1979). Testimony of this nature would also give the appearance of the witness instructing the jury on the law. *United States v. Duncan*, 42 F.3d 97, 102-03 (2d Cir. 1994). Thus,

pursuant to Fed. R. Civ. P. 56(c)(2) this material cannot be presented in a form that would be admissible in evidence.

c. Uncontroverted, but the Plaintiff is not qualified to state a legal opinion about whether the two Defendants were a Single Employer or a Joint Employer. Fed. R. Evid. 704(a). *Randolph v. Collectramatic, Inc.,* 590 F.2d 844, 848 (10th Cir. 1979). Testimony of this nature would also give the appearance of the witness instructing the jury on the law. *United States v. Duncan*, 42 F.3d 97, 102-03 (2d Cir. 1994). Thus, pursuant to Fed. R. Civ. P. 56(c)(2) this material cannot be presented in a form that would be admissible in evidence.

d. Uncontroverted, but the Plaintiff is not qualified to state a legal opinion about whether the two Defendants were a Single Employer or a Joint Employer. Fed. R. Evid. 704(a). *Randolph v. Collectramatic, Inc.,* 590 F.2d 844, 848 (10th Cir. 1979). Testimony of this nature would also give the appearance of the witness instructing the jury on the law. *United States v. Duncan*, 42 F.3d 97, 102-03 (2d Cir. 1994). Thus, pursuant to Fed. R. Civ. P. 56(c)(2) this material cannot be presented in a form that would be admissible in evidence.

e. Uncontroverted, but the Plaintiff is not qualified to state a legal opinion about whether the two Defendants were a Single Employer or a Joint Employer. Fed. R. Evid. 704(a). *Randolph v. Collectramatic, Inc.,* 590 F.2d 844, 848 (10th Cir. 1979). Testimony of this nature would also give the appearance of the witness instructing the jury on the law. *United States v. Duncan*, 42 F.3d 97, 102-03 (2d Cir. 1994). Thus,

pursuant to Fed. R. Civ. P. 56(c)(2) this material cannot be presented in a form that would be admissible in evidence.

72. Controverted in part. The pay stubs indicate the payor was Pioneer Ridge Nursing, but the address was that of Midwest Health, Inc. (Ex. 36, Payroll Stub for Wendy L. Painter)

73. Controverted. The W-2 document in Exhibit shows "Pioneer Ridge Nursing Operations, LLC" (Ex. 5, Wendy L. Painter, W-2 for 2018) This entity is not a registered corporate entity with the Kansas Secretary of State. (Ex. 31, Database Search for "Pioneer Ridge")

Pursuant to Fed. R. Civ. P. 56 and D. Kan. Rule 56.1(b)(2), the Plaintiff states the following additional statements of material fact that are undisputed.

## Facts Related to Plaintiff's termination.

74. The Plaintiff raised her voice only after the resident's son raised his voice while both were standing in the hallway. (Ex. 24, Painter Dep. 70:13-25; 71:1-9)

75. The Plaintiff never refused to take the vital signs of the resident. (Ex. 24, Painter Dep. 70:13-25; 71:1-9)

76. Bell consulted with King-Alvoid before making the decision to terminate the Plaintiff. (Ex. 25, King-Alvoid Dep. 199:4-6; 202:1-5)

77. King-Alvoid always consulted with Bell before making disciplinary decisions about Painter. (Ex. 25, King-Alvoid Dep. 196:13-18)

78. The Plaintiff was terminated for Painter was terminated for either for "failing to meet a reasonable request of a family member, although there was no

neglect  (Ex. 7, Report of Incident KDADS, at 2), for violating any other conduct or work rule of a similar nature not specifically mentioned therein (Ex. 3, Employee Disciplinary Action Record, p. 1, Rule 35) (Ex. 53, Ex. 45 of Vogel Dep., Employee Handbook, p. 29 of 51) taking or distributing photos or videos of a resident or their property at any time, (Ex. 3, Employee Disciplinary Action Record, p. 1, Rule 37)  (Ex. 53, Ex. 45 of Vogel Dep., Employee Handbook, p. 29 of 51), violating the Code of Conduct, (Ex. 3, Employee Disciplinary Action Record, p. 1, Rule 56) (Ex. 53, Ex. 45 of Vogel Dep., Employee Handbook, p. 30 of 51), discourteous conduct toward any patient, visitor, doctor, or employee, unprofessional conduct**,** (Ex. 52, Bell Dep. 90:4-10, Painter Dep. Ex. 8)**,** prior disciplinary notices from at least eleven months before termination and extending back to 2007, (Ex. 26, Sourk Letter, p. 1 & 2)**,** costing the Defendants about $24,000 as a result of an audit by a federal agency, (Ex. 26, Sourk Letter p. 1), or conducted herself unprofessionally in a manner that adversely affected [sic] the facility. (ECF 77, Pretrial Order, Stip. Fact 12) (Ex. 26, Sourk Letter p. 1), or for all of those reasons.

79. The Plaintiff caused a loss to the Defendants of about $24,000 in March of 2017 as a result of a survey or audit by a federal agency. (Ex. 26, Sourk Letter, p. 1 & 3)

80. Pioneer Ridge Nursing provided an outdated and incorrect address for the Plaintiff to KDADS when it submitted the "Alleged Perpetrator Information Form" form to KDADS. (Ex. 24, Painter Dep. 80:19-25; 81:1-5) (Ex. 27, first page)

81. The "Alleged Perpetrator Information Form" is submitted to the Kansas Department for Aging and Disability Services. (Ex. 25, King-Alvoid Dep. 24:16-24)

82. King-Alvoid could not recall whether she completed the first page of the "Alleged Perpetrator Information Form." (Ex. 25, King-Alvoid Dep. 25:22-25)

83. Either King-Alvoid or the administrator filled out the first page of the "Alleged Perpetrator Information Form." (Ex. 25, King-Alvoid Dep. 32: 21-24)

84. The Plaintiff moved to add Pioneer Ridge Nursing Facility Operations, LLC as a Defendant after confirming that it was the correct Pioneer Ridge entity, out of several such similarly named entities, to name as a Defendant. (ECF 49)

85. The Magistrate granted the motion to add Pioneer Ridge Nursing Facility Operations, LLC as a Defendant. (ECF 55 at 12)

86. The Magistrate found that there was no undue delay in adding Pioneer Ridge Nursing Facility, LLC as a party Defendant. (ECF 55 at 6)

87. When Painter complained to Bell about how she was being treated she believes she used the word "discriminating." (Ex. 24, Painter Dep. 93:24,25; 94:1-3)

88. Compared to Black, African-American or African co-workers, Painter was treated with disparity over various issues, including time-off requests, extended vacations, having to find her own substitute for time-off requests, and misconduct that was not disciplined. Those co-workers, not all of whom had the same title but performed many of the same duties and had the same supervisors, were: Cameron Starks-Cowper (Ex. 24, Painter Dep. 109:17-25; 112:1-7); Hannah Hiram (Ex. 24, Painter Dep. 112: 11-25; 116:1-8); and Herbert Gathages (Ex. 24, Painter Dep. 116:9-

25; 118:1-12); Mary Gatotho (Ex. 24, Painter Dep. 118:13-25; 119:1-9); Tiara Taje (Ex. 51, Attachment to EEOC Intake Questionnaire at 2, Painter Dep. Ex. 11); and Taryn Harrell (Ex. 51, Attachment to EEOC Intake Questionnaire at 2 Painter Dep. Ex. 11) See also, Painter Dep. Ex 11).

89. Midwest Health, Inc. performed various Human Resources tasks for Pioneer Ridge Nursing Facility Operations, LLC, including training and preparation of employee handbooks. (Ex. 29, Vogel Dep. 47:10-12) (Ex. 28, Sourk Dep. 18:1-5)**.**

90. Midwest Health personnel are available for the administrator at Pioneer Ridge Nursing Facility Operations, LLC to consult about human resource information. (Ex. 28, Sourk Dep. 88:10-19)

91. C. Marie Vogel is Vice President of Skilled Nursing Facilities for Midwest Health, Inc. (Ex. 29, Vogel Dep. 12:15-24)

92. When the state visits a nursing facility for an on-site survey, Midwest Health provides a consultant to be available for the facility. (Ex. 29, Vogel Dep. 18:2-14)

93. C. Marie Vogel is involved in hiring decisions in facilities managed by Midwest Health, Inc. but not routinely. (Ex. 29, Vogel Dep. 93:9-24)

94. In a letter dated February 7, 2020, counsel for Midwest Health, Inc. incorrectly stated, twice, that the Plaintiff's employer was "Pioneer Ridge Nursing Facility**." (**Ex. 30, Lanterman Letter, p. 1 & 2)

95. The Business Entity database for the Kansas Secretary of State listed seven active entities with the words "Pioneer Ridge" in them. (Ex. 31, Database search of "Pioneer Ridge")

96. None of the "Pioneer Ridge" entities listed in the Business Entity database maintained by the Kansas Secretary of State lists an entity named, "Pioneer Ridge Nursing Facility." (Ex. 31, Database search of "Pioneer Ridge")

97. In Answers to the Plaintiff's Interrogatories, Midwest Health, Inc. denied that it was the Plaintiff's employer, but stated that "Pioneer Ridge" was the employer, (Ex. 32, Answers to Interrogatories Nos. 3 and 4) or that "Pioneer Ridge Nursing Facility" was the employer. (Ex. 32, Answers to Interrogatories 2-5)

98. Cleotha Daniels is named as the representative for Midwest Health, Inc. who verified, under oath, the answers to the Interrogatories. (Ex. 32, Answers to Interrogatories, last page)

99. The Plaintiff served written discovery, including the Interrogatories, on March 25, 2020. (ECF 24)

100. The Defendant's Answers to Interrogatories were verified and served on June 26, 2020. (Ex. 32, Answers to Interrogatories, last page)

101. The Defendant's Answers to Interrogatories were answered 93 days after service of the Interrogatories, or 63 days beyond the period set by Fed. R. Civ. P. 33(b)(2).

102. The Plaintiff filed a Charge of Discrimination that named Pioneer Ridge Health & Rehab as her employer. (Ex. 33, Charge of Discrimination)

16

103. Jennifer Sourk, In-House Counsel for Midwest Health, Inc. sent a position statement to the U.S. Equal Employment Opportunity Commission on January 8, 2019, to respond to the Charge of Discrimination. (Ex. 34, Sourk Letter, p. 1, first paragraph)

104. Kathleen King-Alvoid, the Plaintiff's direct supervisor through the termination of the Plaintiff testified that she worked at a facility known as Pioneer Ridge Health and Rehabilitation. (Ex. 25, King-Alvoid Dep. 18:8-11)

105. According to Jennifer Sourk, "Pioneer Ridge Nursing Facility" employed the Plaintiff. (Ex. 28, Sourk Dep. 23: 11-13)

106. "Pioneer Ridge Nursing Facility" is not registered with the state of Kansas as a Limited Liability Company or as any corporate entity. (Ex. 31, Database search for "Pioneer Ridge")

107. According to Sourk, the Plaintiff worked at "Pioneer Ridge Nursing Facility, LLC." (Ex. 28, Sourk Dep. 27:12-15)

108. According to Sourk, the corporate entity "Pioneer Ridge Health and Rehabilitation" is connected to "Pioneer Ridge Nursing Facility Operations, LLC." (Ex. 28, Sourk Dep. 57:4-8)

109. Midwest Health, Inc. and Pioneer Ridge Nursing Facility Operations, LLC entered into a Management Agreement in 2010. (Ex. 34, Management Agreement)

110. James A. Klausman signed the Management Agreement on behalf of both Midwest Health, Inc. and Pioneer Ridge Nursing Facility Operations, LLC (Ex. 28,

Sourk Dep. 62:20-25; 63:1-7) (Ex. 34, Management Agreement, p. 8) (Ex. 47, Klausman Dep. 9:3-16)

111. James A. Klausman is a shareholder of Midwest Health, Inc. (Ex. 28, Sourk Dep. 63:8-11)

112. James B. Klausman is the son of James A. Klausman (Ex. 28, Sourk Dep. 63:25; 64:1, 2)

113. Michael Klausman is the son of James A. Klausman. (Ex. 28, Sourk Dep. 64:3-6)

114. The trust of James Brett Klausman and the trust of Michael Klausman are part owners through Clayton Enterprises, LLC of Pioneer Ridge Nursing Facility Operations, LLC. (Ex. 28, Sourk Dep. 63:15-25; 64:1-6)

115. The trust of Floyd C. Eaton, III is a part owner of Pioneer Ridge Nursing Facilities Operations, LLC through Clayton Enterprises, LLC. **(**Ex. 28, Sourk Dep. 63:15-25)

116. Floyd C. Eaton, Jr is an officer of Pioneer Ridge Nursing Facility Operations, LLC. (Ex. 28, Sourk Dep. 64:9-13)

117. Floyd C. Eaton, Jr. is a shareholder of Midwest Health, Inc. (Ex. 28, Sourk Dep. 64:14-16)

118. As of February, 2018, the Management Agreement between Midwest Health, Inc. and Pioneer Ridge Nursing Facility Operations, LLC was still in force. (Ex. 28, Sourk Dep. 67:17-19)

119. Jennifer Sourk responded to the Amended Deposition Notice to take the corporate representative deposition of Midwest Health, Inc. (Ex. 35, Am. Dep. Notice) (Ex. 28, Sourk Dep. p.1)

120. The address for Midwest Health, Inc. is 3023 SW Wanamaker Rd., Suite 300, Topeka, Kansas 66614. (Ex. 26, Sourk Letter, Letterhead)

121. "Pioneer Ridge Nursing" issued paychecks for the Plaintiff using the address of Midwest Health, Inc. (Ex. 36, Payroll Stub for Wendy L. Painter)

122. "Pioneer Ridge Health & Rehab" is listed in promotional material as "Proud Member of Midwest Health Family of Communities." (Ex. 37, Brochure, first and third pages)

123. Midwest Health, Inc. made direct deposits into a credit union account held by the Plaintiff with the designation, "ACH MWHINCPOOLED." (Ex. 38, Account Statement of Wendy L. Painter)

124. Midwest Health, Inc. provided health insurance to the Plaintiff through "Midwest Health Management, Inc.," which was the group name used. (Ex. 39, Summary of Claims, Blue Cross Blue Shield of Kansas) (Ex. 7, Sourk Dep. 27:21-25; 28:1-4)

125. The Management Agreement between Midwest Health, Inc. and Pioneer Ridge Nursing Facility Operations, LLC provided for a relationship between the two entities for financing, accounts receivable, accounts payable, requisition of supplies, maintenance, financial reports, income tax returns, developer services, legal services,

and additional services, which included fringe benefits, that is, health insurance and retirement benefits. (Ex. 34, Management Agreement, Para. Nos. 1-10, p. 1-5)

126. The Management Agreement has required the parties to ensure that "the two companies are viewed as separate and distinct entities" and to "at all times maintain that they are separate and distinct legal entities." (Ex. 34, Management Agreement, p. 6, 7)

127. On its Facebook page on August 12, 2020, Midwest Health, Inc. posted jobs available at Pioneer Ridge Health & Rehab. (Ex. 40, Facebook Page)

128. Midwest Health, Inc. provided nurse education to the Plaintiff through a "Corporate Education Nurse" for at least the years 2010, 2012, 2013 and 2015. (Ex. 41, Certificates of Completion).

129. When Painter was assigned to the Rapid Recovery Unit she felt belittled because she was a nurse and not a medication passer. (Ex. 24, Painter Dep., 96:3-13)

130. On October 25, 2018, the Kansas Department for Aging and Disability Services issued a "Notice of Finding of Abuse and Neglect" for the conduct of Wendy Painter as reported by "Pioneer Ridge Nursing & Rehabilitation." (Ex. 42, Notice of Finding of Abuse and Neglect, p.1)

131. The "Notice" provided that if Ms. Painter did not respond in writing within "30 days" the proposed finding would become "a final order confirming the finding." (Ex. 42, Notice of Finding of Abuse and Neglect, p. 4)

132. The "Notice" provided that "all final orders for persons with a nurse aide certificate will be entered on the Nurse Aide Registry." (Ex. 42, Notice of Finding of Abuse and Neglect, p.4, 5)

133. The "Notice" further provided that federal law prohibited the employment of individuals who have had a finding entered into the state Nurse Aide Registry concerning abuse or neglect. (Ex. 42, Notice of Finding of Abuse and Neglect, p. 5)

134. Thirty days from October 25, 2018 was November 24, 2018.

135. No later than May 14, 2019, the Nurse Aide Registry listed Wendy Leanne Painter as having an "Employment Prohibition on File." (Ex. 43, Nurse Aide Registry, p. 1)

136. On February 1, 2021, the Hon. Mary E. Christopher, Shawnee County, Kansas District Court Judge held in *Wendy Leanne Painter v. Kansas Department for Aging and Disability Services,* No. 2020-CV-405 that the "Notice" never became a final order because the "Notice" was never effectively served on the Plaintiff. (Ex. 44, Memorandum Decision and Order, p. 7) The Court may take judicial notice of this adjudicative fact in the "Memorandum Decision and Order" pursuant to Fed. R. Evid. 201(b). "It is well-settled that the decision of another court or agency … is a proper subject of judicial notice." *Opoka v. I.N.S.,* 94 F.3d 392, 394 (7th Cir. 1996). The rules of evidence do not apply to noticed material; therefore the noticed material need not be in a form that would be admissible in evidence. *Garner v. First Nat'l City Bank,* 465 F.Supp. 372, 382, n.12 (S.D. N.Y. 1979).

137. As of March 26, 2021, the Kansas Department for Aging and Disability Services listed Wendy Painter, among others, as having an employment prohibition because of findings of abuse, neglect or exploitation. (Ex. 45, CNAs/CMAs with Findings of Abuse, Neglect or Exploitation. p. 3).

138. Pioneer Ridge provided the Kansas Department for Aging and Disability Services an outdated and incorrect address for the Plaintiff even though it had her current and correct address in its records. (Ex. 24, Painter Dep. 80:19-25; 81:1-5) (Ex. 36, Payroll Stub for Wendy L. Painter, March 13, 2018)[1]

139. The "Notice of Findings of Abuse and Neglect states that KDADS conducted its own investigation concerning the report made by Pioneer Ridge Nursing & Rehabilitation of alleged abuse and neglect by the Plaintiff. (Ex. 42, Notice of Finding of Abuse and Neglect, p. 2)

140. Although the "Notice of Findings of Abuse and Neglect states that KDADS conducted its own investigation concerning the report made by Pioneer Ridge Nursing & Rehabilitation of alleged abuse and neglect by the Plaintiff, there is no description of KDADS obtaining any documents or witness statements beyond what the Defendants supplied to it. (Ex. 42, Notice of Findings of Abuse and Neglect, passim)

141. The Plaintiff did not know of the report by the Defendants to KDADS or of the findings made against her until many months after the findings were made. (Ex. 46, Painter Dep. Ex.5, Email from KDADS to Wendy Painter) (Ex. 24, Painter Dep. 88:2-25; 89:1-24)

---

[1] The Plaintiff notes that in some of the Defendants' exhibits the Plaintiff's correct and current address is redacted.

142. James A. Klausman has sole discretion as to the performance of or modification of the Management Agreement. (Ex.47, Klausman Dep. 22:19-25; 23:1-2)

## I.   Argument and Authorities.

### a.  Standard of Review.

The Plaintiff generally agrees with the Defendants' description of the standard of review. (Def. Br. at 11, 12).

### b.  Defendants as Single Employer or Joint Employer.

The Defendants' maintain that the Plaintiff's employer at all relevant times was Pioneer Ridge Nursing Facility Operations, LLC. (Def. Br. at 13-16)

### 1.  Timeliness of Knowledge of Pioneer Ridge Nursing Facility Operations, LLC and Plaintiff's Knowledge of that Entity.

"Pioneer Ridge Nursing Facility Operations, LLC" had received notice of the Plaintiff's claims as early as the Charge of Discrimination with the U.S. Equal Employment Opportunity Commission. (Ex. 5, Letter of Sourk to EEOC, providing position statement for Pioneer Ridge Nursing Facility Operations, LLC) This Pioneer Ridge entity knew or should have known that it would have been named as a party in the original Complaint but for the Plaintiff's uncertainty about the proper entity defendants.

It was not until June, 2020, that Midwest Health, Inc. provided information under oath in its Answers to Interrogatories about any Pioneer Ridge entity. And, that information was inaccurate. (ASOF ¶ 91) From there it was not until the corporate representative deposition of Jennifer Sourk that additional statements

under oath were made about Pioneer Ridge entities. Even then, Ms. Sourk provided inaccurate recitations of the proper Pioneer Ridge entity (SOF ¶¶ 99, 101) before finally settling on "Pioneer Ridge Nursing Facility Operations, LLC." (SOF ¶ 103)

### 2. Determination of the Single Employer Test and the Joint Employer Test.

The most recent review by the Tenth Circuit of theories of recovery against more than one corporate entity was in *Knitter v. Corvaias Military Living*, 758 F.3d 1214 (10th Cir. 2014). The Court recited three tests: a hybrid test, the joint employer test and the single employer test. *Id.* At 1226.

The joint employer test looks to whether the entities share or co-determine the essential terms and conditions of employment. *Id.* The right to terminate is the most important factor, but additional factors that are relevant include setting work rules, compensation, benefits, hours, supervision of employees, control of employee records such as insurance, payroll, taxes and the like. *Id.*

Here, the parties' Management Agreement sets forth extensive connections between the two entities. (Ex. 34) It is evident that Midwest Health, Inc. controls payroll, (Ex. 36) payroll deposits (Ex. 38), and coverage for health insurance (Ex. 39). Because Midwest Health, Inc. maintains all accounts and records for Pioneer Ridge Nursing Facility Operations, LLC throughout the year, Midwest Health, Inc. is to provide income tax services. (Ex. 34, p.4)

The entities shared some interlocking functions in ownership and officers with the same individuals, or family members, owning and serving both entities. (SOF ¶¶ 104-111)

These entities were tightly bound together and operated as joint employers.

The single employer test is similar to the joint employer test, but this test applies where two entities that are nominally separate should in fact be treated as an integrated enterprise. *Id.* at 1226-27. The focus of this test is on the relationship between the entities. *Id.* at 1227. Four factors apply: 1) interrelations of operation; 2) common management; 3) centralized control of labor relations; and 4) common ownership and financial control. *Id.* Here, factors one, two and four weigh in favor of finding the test for single employer is satisfied.

As to factor one, the Management Agreement reflects a thorough interweaving of corporate rights and duties. That Agreement also exhibits a common management, which satisfies factor two. And, there is common ownership and control, which satisfies factor four.

As to factor three, there is at least some evidence of centralized control of labor relations.

The two entities essentially operated as one.

### 3. Defendants' Cases.

Most of the Defendant's cases either restate the applicable tests when more than one employer is named as a defendant, are inapposite, or help the Plaintiff.

Those cases are: *McGregor v. Snyder*, 427 F.App'x 629, 632 (10th Cir. 2011) (Plaintiff was not mistaken about proper parties' identity); *JP Morgan Chase Bank, N.A. v. Wells Fargo Bank, N.A.*, 2017 WL 1758066 at *3 (N.D. Okla. May 4, 2017) (naming wrong party was "procedural gambit" to avoid arbitration, which compelled

court to deny request for leave to amend); *Odhuno v. Reed's Cove Health & Rehab., LLC,* 2020 WL 1151325 at *8 (D. Kan. March 10, 2020) (issue of material fact over whether single employer test met; issue of material fact over whether plaintiff satisfied joint employer test); *Miller v. Dillon Cos.*, 2016 WL 2894696 at *10 (D. Kan. May 18, 2016) (plaintiff made only conclusory allegations); *Hiralall v. SentosaCare, LLC*, 2016 WL 1126530 at *6 (S.D. N.Y. March 18, 2016) (same); and *Grider v. Shawnee Mission Med. Ctr., Inc.*, 2017 WL 2971967 at *4 (D. Kan. July 12, 2017) (not reasonable to mistake legal identities of a corporation with a living human being).

Issues of material fact exist about whether the two Defendants were a single employer or a joint employer.

### c. The Plaintiff's Prima Facie Case of Reverse Race Discrimination.

The burden of establishing a prima facie case is not onerous. *Plotke v. White,* 405 F.3d 1092, 1099 (10th Cir. 2005), *citing, McCowan v. All Star Maint., Inc.,* 273 F.3d 917, 922 (10th Cir. 2001). The burden is one of production, not persuasion; it can involve no credibility assessment. *Ploteke* at 1099, *citing, Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 142, 120 S.Ct. 2097 (2000).

### i. Evidence of Discrimination Against White Employees.

The Defendants argue that the Plaintiff cannot satisfy her burden to establish a prima facie case of reverse race discrimination to support as required by the *McDonnell Douglas*[2] burden-shifting test for summary judgment motions.

The Defendants further claim that the Plaintiff's burden is that as a White

---

[2] *McDonell Douglas Corp. v. Green,* 411 U.S. 792 (1973).

person she must show that the Defendants are "one of those unusual employers who discriminates against the majority," *citing, Ewing v. TWA Restaurant Group, Inc.,* No. 08-2024-CM (D. Kan. March 12, 2009), which cited, *Argo v. Blue Cross and Blue Shield of Kanas, Inc.,* 452 F.3d 1193, 1201 (10th Cir. 2006). *Argo,* in turn, cited *Notari v. Denver Water Dept.,* 971 F.2d 585, 589 (10th Cir. 1992). (Def. Br. at 16, 17) This is the first step in the prima facie case. *Argo* at 1201.

However, the Defendants omit that, "Alternatively, a plaintiff may produce facts sufficient to support a reasonable inference that but for plaintiff's status the challenged decision would not have occurred." *Argo* at 1201.[3] This evidence may be direct or indirect. *McGarry v. Board of Count Comm'rs of County of Pitkin,* 175 F.3d 1193, 1199 (10th Cir. 1999). Title VII prohibits discrimination against [W]hites as well as non-[W]hites. *Id., citing, McDonald v. Santa Fe Trail Transp. Co.,* 427 U.S. 273, 280, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976).

The Plaintiff contends that she can satisfy the alternate "a but-for" test, for the first step in the prima facie case.

In this case, the Plaintiff's immediate supervisor, Kathleen King-Alvoid who is a Black person. King-Alvoid showed favoritism toward Black, African-American and African employees who were similarly situated to the Plaintiff. That favoritism expressed itself in disparate treatment in time-off requests, requiring the Plaintiff but not the favored employees to find substitutes for time-off requests; and disparity

---

[3] The Plaintiff notes that the court in *Bostock v. Clayton County, Georgia,* 140 S.Ct. 1731 (2020) held that a plaintiff may meet her burden of proof under Title VII by showing that a discriminatory motive for the adverse action was "a but for cause" of the action. *Id.,* at 1739.

in matters of discipline, resulting in no discipline for the favored employees when they made mistakes or refused assignments, but false allegations against the Plaintiff for her work performance, or nitpicking her performance.

### ii. The Plaintiff's Qualification to Work at a Nursing Facility.

The Defendants next allege that the Plaintiff was not qualified to perform her job from which she was terminated. A showing that the Plaintiff was qualified for her job is the second step in the prima facie case. *Argo* at 1201. The basis for this is the finding by the Kansas Department for Aging and Disability Services that the Plaintiff was responsible for abuse and neglect, thus making her ineligible to work in a nursing care facility. (Def. Br. at 18)

A problem for the Defendants now with this argument is a development in a subsequent case filed by the Plaintiff pursuant to the Kansas Judicial Review Act, K.S.A. 77-601, et seq., against KDADS over the validity of its findings. The development means that the Plaintiff is eligible to work in a nursing care facility because the KDADS findings never became a final order.

On February 1, 2021, the Hon. Mary E. Christopher, Shawnee County, Kansas District Court Judge ruled that the finding of Abuse and Neglect by KDADS never became a final order because the agency never effectively served the notice of the findings on the Plaintiff.  (Ex. 44 at 7) Thus, from at least November 24, 2018, SOF ¶ 126, through at least February 2, 2021, SOF ¶ 128, the Plaintiff was inaccurately listed as a person prohibited from working in a nursing care facility.

The Defendants claim no other basis for their position that the Plaintiff is not qualified to perform he former job. To the contrary, Bell testified that if the interactions of February 16, 2018 between the resident's son and the Plaintiff had not occurred, the Plaintiff would still be employed at Pioneer Ridge potentially. (Ex. 52, Bell Dep. 251:20-24)

iii.   **The Adverse Job Action.**

The Defendants do not address the third step of the prima facie case, which is that the Plaintiff have suffered an adverse job action. Ordinarily, this means the Defendants do not allege an absence of evidence for the Plaintiff's on this point. Nevertheless, the Plaintiff will address this point. It is undisputed that the Defendants terminated the Plaintiff. (ECF 77, Pretrial Order, Stip. Fact 11, p. 3)

Termination, or firing, is an action against an employee that is considered to be an adverse job action. *Braxton v. Nortek Air Solutions, LLC,* 769 Fed.Appx. 600, 604 (10th Cir. 2019), *following, Burlington Indus, Inc. v. Ellerth*, 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). This satisfied the third step.

iv.   **The Plaintiff's Position Remained Open.**

The fourth step in the prima facie case is that the Plaintiff was treated less favorably than others. For example, the position at issue remained open after the adverse employment action. *Argo* at 1201.

The Defendants do not contend that the Plaintiff's position was eliminated. Similarly, they do not argue that there is an absence of evidence to support this element as required by case law on summary judgment.

The Plaintiff has cataloged the various ways in which she was subjected to disparate treatment at the hands of King-Alvoid, one of her supervisors. The Plaintiff submits that she has satisfied her burden to state a prima facie case on this claim.

### v.   The Stated Reasons for the Plaintiff's Termination.

If the Plaintiff has established a prima facie case, the burden shifts to the Defendants to come forward with a legitimate nondiscriminatory reason for its action against the Plaintiff. *Mitchell v. City of Wichita, Kansas,* 140 Fed.Appx. 767 (10th Cir. 2005), *citing, McDonnell Douglas v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

The Defendants begin by saying that they terminated Painter because 1) she failed to comply with a reasonable request from a DPOA [Durable Power of Attorney]; and 2) acted discourteously and unprofessionally. (Def. Br. at 19)

Yet, in the very next sentence, the Defendants state the "it was not the first time she violated Pioneer Ridge Nursing's policies. (Def. Br. at 19) The Defendants are suggesting that a past violation of policies was also a reason for the termination.

Additionally, the Defendant's General Counsel Jennifer Sourk told the U.S. Equal Employment Opportunity Commission in response to the Charge of Discrimination filed by Painter that the Defendants terminated Painter because she had cost the Defendants about $24,000 as a result of an audit by the U.S. Department of Health and Human Services of Pioneer Ridge in 2017.

There are a flurry of other reasons that were raised by Sourk in her letter to the EEOC and by the different shades of coloration of the Defendants' rules and policies that were revealed and discussed in depositions.

### vi.    Pretext.

Assuming that the employer states a legitimate business reason for the termination, the burden swings back to the Plaintiff to demonstrate that the employer's stated reasons were false or pretextual. "In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147, 120 S.Ct. 2097 (2000). A plaintiff shows pretext by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them unworthy of credence." *Swackhammer v. Sprint/United Management Co.,* 493 F.3d 1160, 1167 (10th Cir. 2007), *citing, Plotke v. White,* 405 F.3d 1092, 1102 (10th Cir. 2005), *quoting, Morgan v. Hilti, Inc.,* 108 F.3d 1319, 1323 (10th Cir. 1997).

The Defendants have proffered inconsistent explanations for terminating Painter. Violations of work rules, prior violations of policies, and incurring a large expense for the Defendants as a result of an audit have all been offered and reasons.

Some of the stated work rule violations are incoherent. For example, one rule Painter supposedly broke was one prohibiting the taking of photos of a resident. There is no evidence to support that rule violation.

### d. The Plaintiff's Prima Facie Case of Retaliation Under Title VII.

The Defendants assert that the Plaintiff cannot meet the elements required to present a prima facie case of retaliation under Title VII and Section 1981. (Def. Br. at 22, 23) The Defendants address only the first and third element of the prima facie case. They do not squarely challenge the second element, that is, that the Plaintiff suffered a material adverse action. Presumably, they concede that the Plaintiff's termination was a material adverse action.

The Defendants cite *Thompson v. Berry Plastics,* 803 F.3d 510, 514, n.4 (10th Cir. 2015) for the elements of a prima facie retaliation claim. The first element is that the Plaintiff engaged in protected activity. The third element is showing a causal connection between the protected activity and the adverse action. *Id.*

What *Thompson v. Berry Plastics Corp.* does not make clear is the more complete meaning of the second element, a material adverse action. This is important because the full meaning of the element takes in a broader swath of conduct than the incomplete meaning.

This Court in *Thompson v. Tyson Foods, Inc.*, No. 16-2496-DDC, 2018 WL 705667 (D. Kan. Feb. 5, 2018) correctly stated the full meaning of "materially adverse. This Court stated that an employment action is "materially adverse" when it would dissuade a reasonable employee from making or supporting a charge of discrimination. *Id.* at 16, *citing, Burlington N. & Santa Fee Ry Co. v. White*, 548 U.S. 53, 68 (2006). The plaintiff need not prove some tangible, subjective psychological or monetary injury. *Id., quoting and citing, Williams v. W.D. Sports, N.M., Inc.,* 497 F.3d

1079, 1090 (10th Cir. 2007). But the plaintiff must show something more than "petty slights, minor annoyances, and simple lack of good manners." *Id., citing and quoting, Williams* at 1190.

In *Thompson v. Tyson Foods,* this Court noted that the Tenth Circuit has emphasized that this standard requires a careful and calibrated differentiation. *Id.* Threats combined with actions that cause the plaintiff to suffer economically and psychologically are materially adverse. *Id., citing, Williams* at 1090. Repeated threats to issue a written warning to the plaintiff – even an empty threat – can constitute a materially adverse action. *Id., citing, Hallmon v. Advance Auto Parts, Inc.,* 921 F.Supp.2d 1110, 1118 (D. Colo. 2013).

The plaintiff in *Thompson v. Tyson Foods* presented evidence that the plaintiff's supervisor had issued written warnings that prevented plaintiff from transferring to another location after the plaintiff had reported incidents of sex harassment. This qualified as materially adverse to the plaintiff. *Id.*

Another example of the proper application of the *Burlington Northern* standard came in *Managhan v. Worldpay US, Inc.*, 955 F.3d 855 (11th Cir. 2020). There a White plaintiff's reports of mistreatment by a Black supervisor followed by threats of termination and physical harm met the "dissuade a reasonable employee" standard. *Id.,* at 861-868.[4] *Burlington Northern*, itself found that standard to have

---

[4] The panel overruled circuit precedent to the contrary, *Gowski v. Peake,* 682 F.3d 1299 (11th Cir. 2012) *Managhan* at 862. *Managhan* listed *Williams v. W.D. Sports, N.N., Inc.* as stating the correct standard in the Tenth Circuit. *Id.* at 861.

been met where the plaintiff had been reassigned to a less prestigious and more arduous position with a 37-day suspension. *Id.,* U.S. at 70-72.

### i.    The Protected Activity.

The Defendants proclaim that the Plaintiff cannot demonstrate any protected act to support the first element of her prima facie case. The Defendants cite to *White v. CertainTeed Corp.*, No. 17-2262-DDC, 2019 WL 2085671 *19 (D. Kan. May 13, 2019) in support of their argument although a plaintiff need not use "magic words" the plaintiff must convey to the employer the concern that the employer has engaged in a practice made unlawful by Title VII or Section 1981, *citing, Hinds v. Sprint/United Management Co.,* 523 F.3d 1187, 1203 (10th Cir. 2008). Expressing generic dissatisfaction will not do. *White* at *19.

*White* and *Hinds* undermine the Defendants argument. In *White,* the plaintiff never presented his complaints to a supervisor. *White,* at *20. Here, Painter presented specific complaints about disparate discipline, time-off requests and work assignments directly to Bell, who has administrator, was the top supervisor of the facility. Even though Painter did not make specific references to race or national origin, Bell, again as administrator, had day-to-day familiarity not only with King-Alvoid but also the others who worked the floor at the facility whether licensed or certified. That familiarity, as a reasonable jury could infer, put Bell on notice that the disparity in treatment was connected to race. A plaintiff should not be required to present a complaint sufficient under *Twombly-Iqbal* standards when making a

complaint to a supervisor.[5] Moreover, Painter believed she used the word "discriminating" when she complained to Bell. SOF ¶ 87.

*Hinds* represents an inverse fact setting to the fact setting here. Even though the plaintiff in *Hinds* complained in direct terms about age discrimination, he later testified that he was not making a complaint about age discrimination. *Id.,* at 1192. The scenario – report age complaint but later state disclaimer about age complaint – reoccurred with Sprint's CEO as the receiver of the complaint.

In short, the Defendants are asking for a bright-line test that the cases say is not necessary to demonstrate protected activity. Simply because the Plaintiff did not frame her complaints using race discrimination directly the substance of her complaints put Bell on notice that race, at bottom, was the root of the problem Painter brought to her. And this occurred not once, but twice over about a nine-month period. The Plaintiff, though, does concede, that, in context, her complaint about being told not to eat a cookie at the nurse's station while another worker was sucking on sucker is in the category of petty or ill-mannered behavior. SOF ¶ 11.

### ii. Causal Connection Between Protected Activity and Termination.

The Defendants contend that the Plaintiff cannot show the complaints of discrimination was "the but-for cause of her termination." First, the correct standard is "a but-for cause" as the Court in *Bostock v. Clayton County, Georgia*, 140 S.Ct. 1731 (2020) held. "So long as the plaintiff's sex [or race] was one but-for cause of that

---

[5] *Bell Atlantic v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

decision, that is enough to trigger the law." *Id.* at 1739. (noting that other statutes use the word "solely" to require a sole but-for cause showing)

Next, the Plaintiff agrees that the time gap between the last complaint and the Plaintiff's termination was too long to provide causal proof without an additional showing of causation. A three-month gap standing alone will not suffice to prove causation. *Anderson v. Coors Brewing Co.,* 181 F.3d 1171, 1179 (10th Cir. 1999).

However, as the Plaintiff argued above the termination is not the only materially adverse action the Plaintiff sustained under the "dissuade a reasonable employee" standard. Assignment to the Rapid Recovery Unit, which was outside of Painter's normal duties and which she viewed as a much less desirable job assignment, continued after the second complaint. Those reassignments were part of a chain of events that led to the termination.

The assignments to the Rapid Recovery Unit were materially adverse to Painter.

### e. The Plaintiff's Prima Facie Case for Claims of Tortious Interference and of Blacklisting.

The premise of the Defendants' argument is that the Kansas Department for Aging and Disability Services made a finding of Abuse and Neglect in a "Notice of Finding of Abuse and Neglect" dated October 25, 2018. (Ex. 42, p. 1) And, Defendants' assert that they had nothing to do with KDADS findings or the address used to attempt to notify the Plaintiff of its findings. (Def. Br. at 24)

On February 1, 2021, the Hon. Mary E. Christopher, Shawnee County, Kansas District Court Judge ruled that the finding of Abuse and Neglect by KDADS never

became a final order because the agency never effectively served the notice of the findings on the Plaintiff.  (Ex. 44 at 7) Thus, from at least November 24, 2018, ASOF ¶ 134, which was thirty days after the KDADS "Notice," through at least February 2, 2021, ASOF ¶ 136, which was the day after Judge Christopher's Decision, the Plaintiff was inaccurately listed as a person prohibited from working in a nursing care facility.

A key fact issue in this case is how and from whom the KDADS received the outdated and inaccurate address for the Plaintiff. The Defendants disclaim any responsibility for providing the bad address to KDADS. (Def. Br. at 24) They rely on a KDADS email, SOF ¶ 48, in which a KDADS representative told Painter that the notice was sent to the last known address on file. An additional document produced in the related state litigation confirmed that Painter's old and incomplete address was the last known address in KDADS' registry. (Ex. 50, Certificate of Supplemental Agency Record, p. 1 and attachment)

What is important is that the Defendants are asking the Court to infer that the last known address on file with KDADS came from the Plaintiff. But, there is no fact or set of facts upon which to make this inference. The Defendants do not point to any statute or regulation requiring the holder of a certificate controlled by KDADS to notify KDADS of a change of address.

By all appearances, the obligation to provide a correct address to KDADS rests with the employer. Each form that an employer submits for an alleged report of abuse and neglect has space for the employer to provide the employee-certificate holder's

address to KDADS. The purpose of the Nurse Aide Registry is to alert prospective employers of an employment prohibition or the lack of one.

The Plaintiff contends that the Defendants provided the outdated and incorrect address to KDADS through its reporting forms. ASOF ¶ 138.

Another important disputed fact is whether the Defendants had anything to do with the substance of the KDADS findings. The Defendant argue that KDADS performed an independent investigation. (Def. Br. at 24) However, there is nothing in the "Notice" that reflects KDADS obtaining other documents or witness statements beyond what the Defendants supplied to them. This refutes the Defendants' next argument that the Defendants' cannot be responsible for tortious interference because KDADS performed an independent investigation. (Def. Br. at 24, 25)

The Defendants state that the Plaintiff has not produced any evidence that she had an expectancy, or knowledge of expectancy, in any action by KDADS or for any particular future employment. (Def. Br. at 25)

First, whether the Plaintiff had an expectancy, or knowledge of expectancy, of any action by KDADS shows a misunderstanding of the facts. The Plaintiff did not know of any report to KDADS or know of any findings KDADS made against her until many months after the findings were made. Aside from that, the Defendants are attempting to shift blame to KDADS.

Second, the Defendants are asking this Court to believe that even though the Plaintiff held an L.P.N. license – and still does – was not close to retirement age at the time of her termination and had shown no interest in retiring that she,

nonetheless, had no expectancy of future employment in the field and that the Defendants had no knowledge of that expectancy. That is a far-fetched argument.

The Defendants next maintain that the Plaintiff has no evidence of malice by the Defendants. The Defendants misunderstand the type of evidence that a Plaintiff may submit to satisfy this element of the interference claim.

Malice may be proved by circumstantial evidence. The circumstances here were that … King-Alvoid put the Plaintiff in the worst possible light regarding the incident with the resident's son. She completed and submitted the report of alleged abuse forms to KDADS. King-Alvoid submitted the forms to KDADS with an outdated and inaccurate address for the Plaintiff. King-Alvoid had treated Painter with racial disparity compared to similarly situated employees under the direction of King-Alvoid. Finally, King-Alvoid used Bell as her cat's paw[6] to poison the well of goodwill Painter had built up with Bell.

The Kansas cases are instructive in understanding the summary judgment analysis of this claim.

In *Burcham v. Unison Bancorp, Inc.*, 276 Kan. 393, 425, 77 P.3d 130 (2003) the court reversed summary judgment in favor of the employer on an interference claim because the trial court had improperly evaluated motive, justification and harm to the plaintiff. The court held, " [t]he issues of defendants' motive and the presence or absence of malice are typically questions for the jury." *Id.*

---

[6] The Plaintiff's theory of recovery incorporates the cat's paw theory to explain the decision of Bell to terminate Painter. This theory was recognized most prominently in *Staub v. Proctor Hospital,* 562 U.S. 411, 131 S.Ct. 1186 (2011).

As in this case where the Defendants assert a duty to communicate reports of alleged abuse or neglect by their employees, the court in *Cohen v. Battaglia*, 296 Kan. 542, 293 P.3d 752 (2013) addressed a similar argument. There, the court reversed summary judgment for the employer on an interference claim and stated in part: "The problem is the panel's conclusion that Accurso conveyed only 'truthful information' was effectively a factual determination which is inappropriate on a dispositive motion." *Id.,* Kan. at 549.

Here, the Court cannot weigh the allegations of the Defendants that they only performed a regulatory duty in conveying information to KDADS against the allegations of malice as presented by the Plaintiff.

### f.  Requirement of Criminal Conviction to Support Blacklisting.

The Defendants point out that there has been no criminal conviction to support a claim of Blacklisting under K.S.A. 44-119, et seq. The case of *Anderson v. United Tel. Co.,* 933 F.2d 1500, 1502-03 (10th Cir. 1991) held that a criminal conviction was required to support the claim.

The Plaintiff suggests that there is a good faith basis for arguing *Anderson* should be overruled either on the grounds that it was incorrectly decided or that a statutory development after the opinion was issued demands a different result. Under either argument, the Plaintiff contends that a criminal conviction is not necessary to sustain a claim of Blacklisting.

The Plaintiff will be filing a motion to certify this question to the Kansas Supreme Court, which is authorized to accept questions certified to it by this Court as provided in K.S.A. 60-3201, et seq.

The basis for the Plaintiff's argument, in part, is drawn from an opinion from the District Court of Harvey County, Kansas by District Court Judge Richard B. Walker in the case of *Jill D. Rowland v. U.S.A. 800, Inc.*, Case No. 14-CV-12 on February 17, 2015. The Plaintiff has attached a certified copy of the opinion. (Ex. 48, Decision of the Court)

In *Anderson*, the court considered the proper interpretation of the Blacklisting statutes. The first step was to ascertain the Legislature's intent by looking at the statutory language. *Id.,* at 1502. The court noted the legislative purpose was generally expressed in the ordinary meaning of the words used in the statutes. *Id.* The court stated that the Legislature's use of two different terms is presumed to be intentional. *Id.*

The opinion in *Anderson* noted that K.S.A. 44-119 used the terms "guilty" and "liable." The court stated, "Presuming the use of both terms to be intentional, we construe these terms in an ordinary way to mean criminal guilt and civil liability." *Id.,* at 1503. The court cited to no authority for that conclusion.

Judge Walker's opinion takes a similar approach but arrives at a different conclusion. In this part of his opinion, Judge Walker essentially declares that *Anderson* was wrongly decided. He observed BLACK'S LAW DICTIONARY defined

"guilty" as having a criminal law meaning but also "responsible for a civil wrong or answerable in law; legally obligated." (Ex. 48 at 2)

All editions of Black's currently available to counsel, the First, the Fifth, the Eighth, and the Eleventh are consistent with the verbiage cited for "guilty" by Judge Walker. In the First, the first definition is, "Having committed a crime or tort;." BLACK'S LAW DICTIONARY, 1st ed., p. 553 (1891). A "tort" was defined as, "In modern practice, *tort* is constantly used as an English word to denote a wrong or wrongful act, for which an action will lie, as distinguished from a *contract." Id.,* at 1178. (italics in original). In the Fifth, the first definition listed for "guilty" was "Having committed a crime or tort." BLACK'S LAW DICTIONARY, 5th ed., p. 637 (1979). A "tort" was a "Private or civil wrong or injury … " *Id.,* at 1335. In the Ninth, the second definition for "guilty" listed was, "Responsible for a civil wrong, such as a tort or breach of contract." BLACK'S LAW DICTIONARY, 9th Ed., p. 727 (2004). That edition defined "tort" first as "A civil wrong, other than breach of contract, for which a remedy may be obtained ..." *Id.,* at 1527.

The most recent edition of BLACK'S, the Eleventh, was published in 2019. The second definition for "guilty" is "Responsible for a civil wrong, such as a tort or breach of contract." BLACK'S LAW DICTIONARY, 11th Ed. (on-line version). The first definition for "tort" is, "A civil wrong, other than breach of contract, for which a remedy may be obtained, usu. in the form of damages;." BLACK'S LAW DICTIONARY, 11th Ed. (on-line version)[7]

---

[7] BLACK'S LAW DICTIONARY, 11th ed. (on-line version; site last visited August 31, 2020)

Judge Walker's conclusion was driven in part by his review of K.S.A. 44-119a, which was passed into law in 1995. This part of his opinion requires only the Court find that *Anderson* was correct at the time it was issued but became wrong with the passage of this statute. Judge Walker refers to a letter from State Representative Gary Haulmark to the House and Senate committees that conducted hearings on the bill. The Plaintiff has attached the letter. (Ex. 49, Haulmark Letter) The statute sets up a regime of qualified immunity or absolute immunity depending upon what information an employer discloses to a prospective employer of a current or former employee.

The effect of the statute, according to Judge Walker, is to protect employers from civil liability when they disclose *truthful* employee information of the nature described in the statute. (Ex. 48 at 4) (emphasis in original). "Conversely, it appears that legislators were *not* intending to extend such immunity from civil liability to employers who would actively seek to" violate the acts described in K.S.A. 44-117. *Id.* (emphasis in original).

Judge Walker then cleared the Blacklisting statutes as providing for a private right of action. "The second part of the test, whether the legislative history manifests the intent to create a private right of action, is clarified by the action of the 1995 Legislature, or more properly by the legislative *inaction* by leaving the three blacklisting-related statutes on the books while delimiting their application to certain carefully crafted circumstances under K.S.A. 44-119a" (Ex. 48 at 5). He permitted the plaintiff in that case to amend her petition to include a claim of Blacklisting.

The Court should adopt Judge Walker's reasoning and allow Plaintiff to pursue his blacklisting claim against ESU.

Another principle of statutory construction that is applicable here is that statutes that are remedial in nature are to be construed broadly. *See, Squires v. City of Salina*, 9 Kan. App. 2d 199, 202, 675 P.2d 926, 929 (1984) (Kansas law); Tcherepnin v. Knight, 389 U.S. 332, 336, 88 S. Ct. 548, 553, 19 L. Ed. 2d 564 (1967) (federal law). "Remedial statutes are liberally construed to suppress the evil and advance the remedy." Norman J. Singer, 3 Statutes and statutory construction [formerly, Sutherland Statutory Construction], 6th ed., p. 183 (2001). The Age Discrimination in Employment Act and the Pregnancy Discrimination Act have been described as remedial. *Id.,* at 200-201. "'Socioeconomic' legislation has been said to be entitled to a liberal construction." *Id.,* at 201.

Additionally,

> The Court normally interprets a statute in accord with the ordinary public meaning of its terms at the time of its enactment. If judges could add to, remodel, update, or detract from old statutory terms inspired only by extratextual sources and our own imaginations, we would risk amending statutes outside the legislative process reserved for the people's representatives. And we would deny the people the right to continue relying on the original meaning of the law they have counted on to settle their rights and obligations.

*Bostock v. Clayton County,* 140 S.Ct. 1731, 1738 (2020), citing, *New Prime, Inc. v. Oliveira*, 139 S.Ct. 532, 538-539, 202 L.Ed.2d 536 (2019).

In *Bostock,* the court oriented itself to the time of the passage of the statute at issue, which was the Civil Rights Act of 1964. *Id.* The Kansas Legislature passed the Blacklisting statutes in 1897. With that in mind, the Plaintiff turns to the national

and Kansas political climate of the late 1890s. In the summer of 1896, William Jennings Bryan of Nebraska gave his "Cross of Gold" speech to the Democratic national convention on behalf of "free silver." Kenneth S. Davis, "Kansas: A History" p. 160 (1984) (first published in 1976). In the elections of 1896, the Populist Party in Kansas won every statewide office and won majorities in both houses of the Legislature. *Id.* The Populist Party stood for, among other reforms, a graduated income tax, an eight-hour work day, "free silver" in a ratio of sixteen-to-one and government ownership of the railroads, telegraph and telephone. *Id.,* at 154. The Legislature of 1897 operated in this milieu.

The original "What's the Matter with Kansas" was a rhetorical shot at the Populists in Kansas. Calder M. Pickett, VOICES OF THE PAST: KEY DOCUMENTS IN THE HISTORY OF AMERICAN JOURNALISM. p. 200 (1977). The piece, written by William Allen White, editor of "The Emporia Gazette," was published in August of 1896. It delivered a glancing blow at Bryan's speech in a sarcastic tone. *Id.,* at 202. It was such a hit that the Republican National Committee picked it up and used it against Bryan in the campaign. *Id.,* at 200.

In retrospect, the mood was that, "[T]he Populists saw their movement as a sort of revelation, a moment when an entire generation of 'Kansas fools' figured out that they'd been lied to all their lives." Thomas Frank, WHAT'S THE MATTER WITH KANSAS: HOW CONSERVATIVES WON THE HEART OF AMERICA p. 34 (2004). When White looked back in a retrospective column in 1936, "he saw Populism not as an episode of mass hysteria but as the respected granddaddy of all reformers who had come since

– Teddy Roosevelt, Woodrow Wilson and now FDR."[8] Thomas Frank, THE PEOPLE, NO: A BRIEF HISTORY OF ANTI-POPULISM, p. 87 (2020).[9]

Opponents of this statutory interpretation must explain why the Legislature would pass a set of statutes that now, under *Anderson,* can rarely, if ever, be enforced.

The Blacklisting statutes were meant to be stiff economic medicine for workers – the people. This Court should enforce them.

g.  **The Claims under Title VII, Section 1981 and Kansas Common Law are Timely as to Pioneer Ridge Nursing Facility Operations, LLC.**

The Defendants contend that the Plaintiff's claims against "Pioneer Ridge Nursing" were not filed in time to meet the 90-day deadline for the Title VII claims, were not filed in time to meet the two-year deadline for the tortious interference claim and that because the Blacklisting claim is subject to a one-year statute of limitations that claim was not timely filed. (Def. Br. at 27)

The Plaintiff seeks relation back under Fed. R. Civ. P. 15(c) by adding Pioneer Ridge Nursing Facility Operations, LLC effective as of the date of filing of the original Complaint. The Defendants continue to blithely ignore the fact that "Pioneer Ridge Nursing" is not, and has not been, on file with the Kansas Secretary of State as a corporate entity. It has long been held that a corporate party that does not exist has no capacity. *Krutz v. Paola Town Co.,* 20 Kan. 397, 403 (1878).

---

[8] William Allen White, "40 Years: New Men, Old Issues," THE NEW YORK TIMES, August 9, 1936.
[9] The book's title is a twist on the Carl Sandburg poem, "The People, Yes": "When have the people been half as rotten as what the panderers to the people dangle before crowds?" *Id.,* prefatory material.

Relation back is conditioned on Rule 15(c)(1)(C)(i) and (ii), which requires that the party added received such notice of the action that it will not be prejudiced in defending on the merits; and the party knew or should have known that the action would have been brought against it, but for a mistake concerning he proper party's identity.

"Pioneer Ridge Nursing Facility Operations, LLC" had received notice of the Plaintiff's claims as early as the Charge of Discrimination with the U.S. Equal Employment Opportunity Commission. (Ex. 5, Letter of Sourk to EEOC, providing position statement for Pioneer Ridge Nursing Facility Operations, LLC) This Pioneer Ridge entity knew or should have known that it would have been named as a party in the original Complaint but for the Plaintiff's uncertainty about the proper entity defendants.

The Defendants present similar arguments that they did in opposing the Plaintiff's motion (ECF 49) for leave to amend and to add a defendant. (ECF 51) In reviewing the motion briefs and the records supplied to her, the Magistrate found that she could not find "based on the present record" that Painter's claims necessarily relate back. (ECF 55 at 10) However, the Magistrate did find that, "If anything, the record on this point suggests that Midwest Health and Pioneer Ridge Nursing are sufficiently affiliated that Pioneer Ridge Nursing likely did receive notice of this action and knew that it should have been named as a defendant." (ECF 55 at 10)

The Defendants have added nothing to the opening brief for summary judgment from what was presented to the Magistrate on this point.

The Plaintiff filed a Charge of Discrimination that named Pioneer Ridge Health & Rehab as her employer. (Ex. 33, Charge of Discrimination) In response, Jennifer Sourk, General Counsel for Midwest Health, Inc., sent a position statement to the U.S. Equal Employment Opportunity Commission. (Ex. 5, p.1, first paragraph)

Counsel for Midwest Health, Inc. incorrectly stated, twice, in a letter dated February 7, 2020, that the Plaintiff's employer was "Pioneer Ridge Nursing Facility." (Ex. 30, Lanterman Letter) **"Pioneer Ridge Nursing Facility"** was not, and has not been, a corporate entity registered with the Kansas Secretary of State.

In Answers to the Plaintiff's Interrogatories, Midwest Health, Inc denied that it was the Plaintiff's employer, but stated that "Pioneer Ridge" was the employer, (Ex. 32, Answers to Interrogatories No. 3 and 4), or that "Pioneer Ridge Nursing Facility" was the employer. (Ex. 32, p. 2-5) Those interrogatories were served on March 25, 2020. (ECF 24) But they were not answered and served until June 26, 2020. (Ex. 32, last page)

It was then that Midwest Health, Inc. finally provided information under oath in its Answers to Interrogatories about any Pioneer Ridge entity. And, that information was inaccurate. From there it was not until the corporate representative deposition of Jennifer Sourk that additional statements under oath were made about Pioneer Ridge entities. Even then, Ms. Sourk provided inaccurate recitations of the proper Pioneer Ridge entity before finally settling on "Pioneer Ridge Nursing Facility Operations, LLC."

All of this tends to establish that Pioneer Ridge Nursing Facility Operations, LLC had notice early on. It has been able to defend itself fully in this action.

As to the applicable statutes of limitations, the Plaintiff does not take issue with the Magistrate's recitation of those limits with the exception of the Blacklisting statute. Judge Mitchell stated that the Blacklisting claim was subject to a one-year statute of limitations, as provided by K.S.A. 60-514(c), because the action is based on a statutory penalty or forfeiture. The Magistrate then cited *Harris v. City of Russell, Kan.*, No. 93-1071-PFK, 1994 WL 240759 at *10 (D. Kan. May 13, 1994) in support. (ECF 55 at 7, 8)

The Plaintiff's position is that is the Blacklisting claim is subject to a three-year statute of limitations as provided at K.S.A. 60-512(2) as an action upon a liability created by a statute other than a penalty or forfeiture. The Kansas Supreme Court held in *McCormick v. City of Lawrence*, 278 Kan. 797, 104 P.3d 991 (2005) that the strip and body cavity search damages statute, K.S.A. 22-2523, was subject to the three-year statute of limitations even though it contains a penalty provision. The Plaintiff will be asking the Court to certify this question to the Kansas Supreme Court.

*McCormick* post-dates *Harris*, and is therefore a more authoritative reading of Kansas law than *Harris*.

Respectfully submitted,

*/s/ Theodore J. Lickteig*
Theodore J. Lickteig
Kan. Bar No. 12977
Lickteig Law Firm, LLC
12760 West 87th Street, Suite 112
Lenexa, Kansas 66215-2878
913-894-1090
tjllawoffice@planetkc.com
*Attorney for Plaintiff*

## CERTIFICATE OF SERVICE

I, Theodore J. Lickteig, hereby certify that I filed the above and foregoing by using the court's CM/ECF system on this 27th day of March, 2021, which will provide notice to:

Stephen D. Lanterman
Kelly J. Trussell
Sloan, Eisenbarth, Glassman, McEntire & Jarboe, L.L.C.
534 S. Kansas Avenue, Suite 1000
Topeka, Kansas 66603
slanterman@sloanlawfirm.com
ktrussell@sloanlawfirm.com
*Attorneys for Defendants*

*/s/ Theodore J. Lickteig*